IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

RAHEEM SHABAZZ,

                              Plaintiff,        Civil Action No.
                                               9:10-CV-1212 (NAM/DEP)

        v.

G.R. BEZIO, *et al.*,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

RAHEEM SHABAZZ, *Pro Se*
96-A-5174
Orleans Correctional Facility
3531 Gaines Basin Rd.
Albion, NY 14411

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN                 TIFFINAY M. RUTNIK, ESQ.
New York State Attorney General          Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Raheem Shabazz, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 against three corrections employees alleging that they deprived him of his civil rights. In his complaint, plaintiff claims that his Fourteenth Amendment procedural due process rights were violated when two of the defendants subjected him to two separate impartial disciplinary proceedings that led to guilty determinations and the imposition of punishments resulting in an aggregate period of keeplock confinement of more than thirty days, with the third defendant acting in concert with their actions.

Currently pending before the court is a motion brought by the three named defendants for summary judgment seeking dismissal of plaintiff's complaint in its entirety. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). <u>Dkt. No. 37 at 1</u>. While he is now incarcerated elsewhere, at

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

all times relevant to his claims in this action, Shabazz was confined at the Clinton Correctional Facility Annex ("Clinton Annex"), which is located in Dannemora, New York. Dkt. No. 37 at 2.

Plaintiff was transferred to the Clinton Annex on March 27, 2008. Dkt. No. 57-4 at 1. Upon his arrival, he was interviewed by defendant Edwin Rice who, at the time, served as a draft sergeant at the facility. *Id.* at 1. When plaintiff arrived at the Clinton Annex, his hair was styled in long dreadlocks. Dkt. No. 57-4 at 2; Dkt. No. 57-9 at 16-17. Plaintiff had previously worn his hair in dreadlocks while in DOCCS custody since 1996, and at no point during his period of incarceration had he ever been questioned about, or disciplined as a result of, his hair style. Dkt. No. 57-9 at 16, 43. During the initial interview at the Clinton Annex, however, defendant Rice advised plaintiff that only members of the Rastafarian faith were allowed to wear their hair in dreadlocks in DOCCS facilities. Dkt. No. 57-4 at 2; Dkt. No. 57-9 at 18. Because plaintiff was, at the time, a DOCCS-registered adherent to the Moorish Science Temple religion, defendant Rice ordered plaintiff to cut his hair or change his religion to Rastafarian. Dkt. No. 57-4 at 2; Dkt. No. 57-9 at 20.

On an unknown date between March 27, 2008 and April 2, 2008, plaintiff submitted a written complaint regarding Rice's orders to comply

3

with DOCCS rules, and requested permission to maintain his dreadlocks pursuant to the "grandfather clause." Dkt. No. 57-5 at 13, 17-18; Dkt. No. 57-9 at 25. Defendant Gary Bezio, a lieutenant at the Clinton Annex who was assigned to investigate the complaint, interviewed plaintiff concerning his dreadlocks on April 2, 2008. [2] Dkt. No. 57-5 at 13. During the interview, at which defendant Rice was also present, defendant Bezio observed plaintiff wearing a Tsalot-Kob, a head covering that allows a person to tuck long dreadlocks inside. Dkt. No. 57-3 at 1, 2; Dkt. No. 57-9 at 13, 23-24. Through his investigation, defendant Bezio learned that plaintiff was not a Rastafarian, and therefore was not permitted to wear dreadlocks pursuant to a DOCCS directive stating that only Rastafarians were allowed to wear dreadlocks. Dkt. No. 57-3 at 2; Dkt. No. 57-5 at 13-14; Dkt. No. 57-9 at 27, 28. Thereafter, defendant Bezio gave plaintiff a direct order to comply with

---

[2]     In his affidavit, defendant Bezio denies being assigned to investigate plaintiff's written complaint on April 2, 2008. Dkt. No. 57-3 at 3. Instead, defendant Bezio states that he was making rounds at the Clinton Annex on that date when he observed plaintiff wearing a Tsalot-Kob, a head covering that enables the wearer to tuck long dreadlocks inside, and questioned him about it. *Id.* at 2. A review of the transcript from plaintiff's disciplinary hearing on May 2, 2008, however, indicates otherwise. Dkt. No. 57-5 at 13. At the hearing, defendant Bezio testified, "On April 2 I conducted an interview with Inmate Shabazz pertaining to his ah dreadlocks. Ah he filed a written complaint on [defendant Rice] and it was my duty to ah investigate that complaint and at that time I ah interviewed Inmate Shabazz pertaining to his dreadlocks." Dkt. No. 57-5 at 13; *see also* Dkt. No. 57-5 at 17 ("Inmate Shabazz field a written complaint against Sergeant Rice ah during a previous interview and it was my responsibility to ah investigate this ah this complaint."). As will be discussed more completely below, whether defendant Bezio was assigned to investigate plaintiff's complaint against defendant Rice is material to plaintiff's due process claim.

DOCCS regulations, though the substance of that direct order is unclear. The record reflects that one of three possible verbal directives may have been given to plaintiff, including to (1) either stop wearing a Tsalot-Kob or change his religion to Rastafarian; (2) cut his dreadlocks because only Rastafarians were permitted to wear dreadlocks; or (3) tie his hair back in a ponytail, which would comply with DOCCS grooming standards. Dkt. No. 57-3 at 2; Dkt. No. 57-5 at 14, 18.

Following this interview, plaintiff applied to change his religion to Rastafarian. Dkt. 57-3 at 19. On April 13, 2008, that request was denied on the basis that plaintiff had applied to change his religion within the previous twelve months.[3] *Id.*

On or about April 14, 2008, defendant Rice observed plaintiff wearing his hair in a style that violated DOCCS rules, and ordered that he cut his hair. Dkt. No. 57-4 at 2-3. When plaintiff refused, defendant Rice issued an inmate misbehavior report charging him with violating two DOCCS rules.[4] Dkt. No. 57-4 at 2, 5. Although plaintiff contends that

---

[3]     According to DOCCS Directive 4202, inmates are only allowed to change religious designations once every twelve months. Dkt. No. 57-3 at 19. In this case, plaintiff had last changed his religious designation on September 21, 2007, rendering his request to change his religion in April 2008 untimely. *Id.*

[4]     Specifically, defendant Rice accused plaintiff of violating (1) DOCCS rule 110.33, which provides that "[a]n inmate wearing hair below shoulder length shall keep his or her hair tied back in a ponytail with a barrette, rubber band, or other fastening

defendant Rice issued this report at the direction of defendant Bezio, both defendants Rice and Bezio deny that allegation. [Dkt. No. 57-3 at 3](); [Dkt. No. 57-4 at 2](); [Dkt. No. 57-9 at 29](); [Dkt. No. 66-3 at 2]().

Three days after the misbehavior report was issued, defendant Bezio conducted a Tier II disciplinary hearing on the charges contained in the report.[5] [Dkt. No. 57-3 at 2-3](). At plaintiff's deposition in connection with this action, he testified that he requested defendant Bezio to recuse himself from conducting the disciplinary hearing in light of the fact that defendant Bezio had been involved in the underlying investigation preceding the misbehavior report. [Dkt. No. 57-9 at 44-45](). According to plaintiff, defendant Bezio denied that request.[6] *Id.* at 45. During the disciplinary hearing, although plaintiff admitted that he refused defendant Rice's direct order to cut his hair, he claimed he did have his hair tied back

---

device approved by the superintendent"; and (2) DOCCS rule 106.10, providing "AN INMATE SHALL OBEY ALL ORDERS OF DEPARTMENT PERSONNEL PROMPTLY AND WITHOUT ARGUMENT." 7 N.Y.C.R.R. § 270.2(B) (emphasis in original).

[5]     The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[6]     The transcript of the disciplinary hearing held on April 17, 2008, does not reflect either plaintiff's request that defendant Bezio recuse himself or defendant Bezio's refusal. [Dkt. No. 57-3 at 11-17]().

in a ponytail. Dkt. No. 57-3 at 4, 15; Dkt. No. 57-5 at 15. In light of defendant Rice's report and plaintiff's testimony, defendant Bezio found plaintiff guilty of refusing a direct order but found him not guilty of having unfastened hair. Dkt. No. 57-3 at 4. Prior to rendering his decision, defendant Bezio also independently reviewed the DOCCS directive that permitted only Rastafarians to wear their hair in dreadlocks. *Id.* Defendant Bezio recorded his findings on a disposition sheet, and sanctioned plaintiff to thirty days of keeplock confinement, with a corresponding loss of certain prison privileges. *Id.* at 4, 21. Plaintiff's appeal of that disposition to the superintendent was denied on April 21, 2008. *Id.* at 24.

On April 29, 2008, while plaintiff was being escorted by another corrections officer to receive his daily medication, defendant Bezio again observed him wearing his hair in a Tsalot-Kob, in violation of his order on April 2, 2008. Dkt. No. 57-3 at 5; Dkt. No. 57-9 at 41. Plaintiff's Tsalot-Kob was confiscated, revealing that he also did not have his hair tied back in a ponytail. Dkt. No. 57-3 at 5. Following this encounter, defendant Bezio issued an inmate misbehavior report charging plaintiff with violating his April 2, 2008 order, and not wearing his hair tied back in a ponytail. *Id.* at 5, 26.

On May 2, 2008, a Tier II disciplinary hearing was held by defendant

Peter Chase, another corrections lieutenant at the Clinton Annex, in connection with the inmate misbehavior report issued by defendant Bezio. Dkt. No. 57-5 at 1-2. After plaintiff testified in his defense, defendant Chase adjourned the hearing for approximately one hour while he located defendant Bezio to secure his testimony.[7] Dkt. No. 57-5 at 13; Dkt. No. 66-4 at 2. While plaintiff understood and consented to the adjournment, he allegedly objected, off the record, to the manner in which defendant Bezio was summoned to testify, arguing that defendant Bezio could (and should) have been paged or summoned by telephone. Dkt. No. 57-5 at 13, 30; Dkt. No. 66-4 at 2. The hearing tape did not record any conversations that took place during the period of adjournment. Dkt. No. 57-5 at 13; Dkt. No. 66-4 at 2. According to defendants Bezio and Chase, they did not discuss defendant Bezio's testimony in advance, and did not have any off-the-record conversations regarding the plaintiff's disciplinary charges. Dkt. No. 57-3 at 5; Dkt. No. 57-5 at 3. Plaintiff, however, contends that defendant Chase "held off the record discussions with Bezio about the case." Dkt. No. 66-4 at 2. Plaintiff also alleges that, off the record, defendant Bezio harassed him by instructing him to "just plead guilty and get this over with." Dkt. No. 57-9 at 60.

---

[7]      Specifically, defendant Chase adjourned at 11:20 AM, and resumed the hearing at 12:40 PM. Dkt. No. 57-5 at 13.

After the disciplinary hearing resumed on the record, defendant Bezio testified concerning the information contained in his misbehavior report and the orders he issued to plaintiff on April 2, 2008. Dkt. No. 57-5 at 13. Following defendant Bezio's testimony, defendant Chase found plaintiff guilty of both violating a direct order and having untied hair, and imposed a second sentence of thirty days keeplock confinement, with a corresponding loss of privileges. *Id.* at 3, 13, 27. Plaintiff's appeal of defendant Chase's hearing disposition to the superintendent was denied on May 9, 2008. Dkt. No. 57-5 at 29.

On March 16, 2009, the DOCCS administratively reversed and expunged the disciplinary determinations rendered by both defendants Bezio and Chase. Dkt. No. 57-9 at 49. By the time his sentences were vacated, plaintiff had served an aggregate total of thirty-six days in keeplock confinement as a result of the two Tier II hearings. *Id.* During that period of confinement, plaintiff was allowed to leave his cell for an hour of recreation each day, twice per day to receive his medication, and during his allotted shower time three days per week. Dkt. No. 57-9 at 36-37. Whenever he left his cell, plaintiff was placed in restraints. *Id.* at 36.

At his deposition, plaintiff distinguished between the conditions of his keeplock confinement from those in general population. While inmates in

general population have access to a shower at any given time, those in keeplock are allowed to shower only three times per week. Dkt. No. 57-9 at 37. During his keeplock confinement, plaintiff was not permitted to attend religious services, work at his job in the tailor shop, or tutor the inmates in the college program, as he had while in general population. *Id.* at 38-39, 74-75.

Some of the conditions of plaintiff's keeplock confinement are disputed between the parties. While defendants contend that the two keeplock cells at the Clinton Annex contain a bed, mattress, pillow, washstand, and lighting, plaintiff testified at his deposition that his cell had no furniture and he was forced to eat his meals on the floor.[8] Dkt. No. 57-8 at 1-2; Dkt. No. 57-9 at 33. According to plaintiff, while confined in keeplock, the toilet in his cell would not flush for five days. Dkt. No. 57-9 at 33-34. Additionally, plaintiff testified that other inmates on his floor would throw feces and it, "along with urine and water and stuff like that," would seep underneath the door into his cell. Dkt. No. 57-9 at 33, 35. Defendants have submitted evidence, however, reflecting that during the time of plaintiff's keeplock confinement, there were no documented instances of either inmates throwing feces on his cell block or feces being cleaned up.

---

[8]     There is also record evidence that one of the two keeplock cells has a locker and the other has a built-in desk with a chair. Dkt. No. 57-8 at 2.

[Dkt. No. 57-6 at 3](); [Dkt. No. 57-8 at 2-3]().

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on October 12, 2010. [Dkt. No. 1](). Plaintiff's complaint names as defendants Corrections Sergeant E. Rice and Corrections Lieutenants G.R. Bezio and Peter Chase, all three of whom were stationed at the Clinton Annex at the relevant times. *See generally id.*

In response to plaintiff's complaint, defendants moved to dismiss plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Dkt. No. 17](). Following a review of the motion, Magistrate Judge David R. Homer issued a report to Senior District Judge Norman A. Mordue recommending that it be granted. [Dkt. No. 21](). Judge Mordue adopted the report, and plaintiff's complaint was dismissed on February 8, 2012. [Dkt. No. 23](). The resulting judgment dismissing plaintiff's complaint, however, was reversed on appeal by the United States Court of Appeals for the Second Circuit, which concluded, *inter alia*, that plaintiff's complaint should not have been dismissed without first granting him leave to amend.[9] *See generally* [Dkt. No. 31](). Plaintiff's case was remanded for

_____

[9]      More completely, following its *de novo* review of the district court's decision, the Second Circuit found the aggregated time plaintiff allegedly spent in keeplock may have been sufficient to constitute an "atypical and significant hardship," but noted that

further proceedings, and the matter was reassigned to me. Dkt. Nos. 31, 32.

Pursuant to the Second Circuit's mandate, plaintiff filed an amended complaint on April 24, 2013.[10] Dkt. No. 37. Liberally construed, plaintiff's amended complaint alleges that he was denied due process because he was twice denied impartial disciplinary hearings as a result of which he was placed in keeplock confinement for an aggregate period of thirty-six days, with a corresponding loss of privileges. *See generally id.*

---

plaintiff failed to allege detailed facts concerning the conditions of his keeplock confinement. Dkt. No. 31 at 2, 5. The court also found that plaintiff's complaint alleged facts which, taken as true, were sufficient to plausibly suggest that defendant Bezio was not an impartial decisionmaker. *Id.* at 6. Further, because there was some ambiguity as to which document defendant Bezio relied upon to make his guilty determination at the disciplinary hearing on April 17, 2008, the court was unable to analyze whether there was reliable evidence of plaintiff's guilt. *Id.* at 6-7. In addition, because no case law was cited in support of the dismissal of the claims against defendants Rice and Chase, the Second Circuit held that plaintiff should be afforded an opportunity to amend his complaint to further develop his factual allegations with regard to those defendants. *Id.* at 7-8. Finally, the Second Circuit inquired into whether plaintiff's complaint inartfully alleged a claim against Norman Bezio, the DOCCS employee designated to hear appeals from inmate disciplinary hearings and allegedly the brother of defendant G.R. Bezio, and determined plaintiff should be allowed to add him as a defendant if he decided to file an amended complaint. *Id.* at 8.

[10]    Although it appears that plaintiff requested summary judgment in his amended complaint, Dkt. No. 37 at 10, he has failed to adhere to requirements governing a summary judgment motion set forth in the local rules of practice for this court. *See* N.D.N.Y. L.R. 5.1(a) (requiring memorandum of law and supporting affidavit for all motions); N.D.N.Y. L.R. 7.1(a)(3) (requiring submission of a statement of material facts in support of a motion for summary judgment). For that reason, to the extent his amended complaint may be liberally construed as a motion for summary judgment, that motion is denied. *See, e.g., Dorsey v. Artus*, No. 09-CV-1011, 2013 WL 5463720, at *6 (N.D.N.Y. Sept. 30, 2013) (Sharpe, C.J., *adopting report and recommendation by* Peebles, M.J.) (dismissing the plaintiff's motion for summary judgment because, *inter alia*, he failed to comply with the procedural requirements set forth in rule 7.1 of the local rules of practice).

Following the completion of discovery, defendants filed the pending motion for summary judgment, arguing that, despite plaintiff's efforts to cure the deficiencies contained in his initial complaint, the claims set forth in his amended complaint nonetheless lack merit. Dkt. No. 57 at 5. Defendants further argue that they are entitled to immunity from suit pursuant to the Eleventh Amendment, to the extent they are sued in their official capacities, and are likewise entitled to qualified immunity. Dkt. No. 57 at 8-9, 21-22. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford*

13

*v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at 1866; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Eleventh Amendment Immunity

Defendants contend that they are shielded from suit under the Eleventh Amendment to the extent plaintiff's amended complaint asserts claims for damages against them in their official capacities. Dkt. No. 57-1 at 8-9. The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest.[11] *See, e.g., Daisernia v. State of*

---

[11]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this

*N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of N.Y. App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing, *inter alia*, *Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."[12] *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that those claims be

---

country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of N.Y. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006).

[12]  By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

dismissed with prejudice.

    C.    <u>Plaintiff's Due Process Claims</u>

Plaintiff contends that he was denied due process at the April 17, 2008, and May 2, 2008, disciplinary hearings. Dkt. No. 37 at 2-9. Liberally construed, plaintiff's complaint alleges that he was deprived of his liberty interest in remaining free from keeplock confinement for an aggregate total of thirty-six days without being afforded sufficient process at those disciplinary hearings. *Id.* Defendants argue that plaintiff's claims are without merit. Dkt. No. 57-1 at 9-19.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). I will address each requirement in turn.

    1.    <u>Liberty Interest</u>

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general

prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* inquiry. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).[13] Accordingly, to avoid the entry of summary judgment, plaintiff must have proffered evidence from which a reasonable factfinder could conclude that the conditions of his keeplock confinement rose to the level of an atypical and significant hardship under *Sandin. See, e.g., Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) ("[W]here the nonmoving party bears the burden of proof at trial. . . it is [his] burden to come forward to demonstrate that there are issues that must be decided by the factfinder because they may reasonably be

---

[13]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

decided in favor of either party." (citations omitted)).

When analyzing the conditions of an inmate's keeplock confinement, the relevant factors for consideration include "'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed[.]'" *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)). As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133 (citing *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000)). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999)).

The Second Circuit has stated that disputes regarding the conditions

of a plaintiff's confinement may not be resolved on summary judgment. *Davis*, 576 F.3d at 134 (quoting *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004). "Only when the conditions are uncontested may a district court resolve the issue of a typicality of confinement as a matter of law." *Id.*

Here, according to plaintiff, he was confined in keeplock for thirty-six days. Dkt. No. 57-9 at 49. Accordingly, the court must inquire into the conditions of plaintiff's keeplock confinement because the duration of his disciplinary confinement does not, on its own, rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133; *see also Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 248 (S.D.N.Y. 1998) ("The decisions of the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York is not 'atypical or significant hardship' under *Sandin*." (quotation marks omitted) (listing cases)). Plaintiff has set forth evidence that the conditions of his keeplock confinement were more serious than the conditions imposed on those inmates in general population. For example, at his deposition, plaintiff testified that he had no furniture on which to eat, and was therefore required to eat on the floor. Dkt. No. 57-9 at 33. He also testified that, whenever he left his cell, he was restrained by "shackles," and he was permitted a ten-minute shower only three times per week. *Id.* at 36-37. Shabazz was also

allegedly precluded from attending church services and working either in the tailor shop or as a tutor, and specifically testified that, "[a]t no time do you leave the keep-lock cell unless you go to medication, hour of recreation, or a ten-minute shower." *Id.* at 37-39. Finally, plaintiff alleges that his toilet would not flush for five days, and feces seeped into his keeplock cell during his confinement. *Id.* at 33, 35.

To counter these assertions, defendants have submitted evidence in support of their motion suggesting plaintiff's keeplock cell, at a minimum, had a bed, mattress, pillow, washstand, and lighting. Dkt. No. 57-8 at 1-2. Moreover, one of the two keeplock cells at the Clinton Annex had a locker, and the other had a built-in desk with a chair. *Id.* Kathryn Lehman is a Keyboard Specialist 1 for the DOCCS who has access to the Clinton Annex logbook as part of her duties. Dkt. No. 57-6 at 3. In her affidavit submitted in support of defendants' pending motion, she stated that, during plaintiff's keeplock confinement, there were "no incidents of inmates on plaintiff's cell block being charged with disciplinary offenses for throwing feces," nor were there any "documented incidents of staff cleaning in that time period[.]" *Id.* at 3. There is also evidence that plaintiff was permitted to leave his cell twice per day for approximately twenty minutes to obtain his medications. Dkt. No. 57-9 at 36-37.

Although I am doubtful that plaintiff will be able to demonstrate that the conditions of his keeplock confinement were sufficient to create an "atypical and significant hardship,"[14] I remain mindful that such a consideration, where there is a dispute of fact regarding the conditions, should be left for the factfinder at trial. *See Palmer*, 364 F.3d at 64 ("Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." (citations omitted)); *Sealey*, 197 F.3d at 585 ("The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the confinement are reasonably in dispute, the jury . . . must resolve those disputes[.]").

---

[14]     *See Sealey*, 197 F.3d at 587, 589-90 (affirming the district court's conclusion that the plaintiff's 101-day confinement in the facility's special housing unit did not constitute an atypical hardship, even where the plaintiff was confined in his cell for twenty-three hours a day, permitted one hour for recreation, limited to three showers per week, subject to noisy neighboring cells, lost various privileges, and had feces thrown at him "a few times"); *Arce v. Walker*, 139 F.3d 329, 336-37 (2d Cir. 1998) (finding the plaintiff's eighteen-day administrative segregation to did not constitute an atypical and significant hardship where he was entitled to only one hour of exercise per day and could not attend church services or communal meals, even considering that, for fifteen days, the plaintiff was deprived exercise because, during those fifteen days, he was provided "out-of-cell privileges," including attendance at court proceedings).

## 2. Process Afforded at the Disciplinary Hearings

Having found an issue of material fact concerning whether plaintiff was deprived of a cognizable liberty interest, I must next examine whether he was afforded sufficient due process during the disciplinary proceedings resulting in his keeplock confinement. *See Tellier*, 280 F.3d at 79-80 (requiring that a plaintiff demonstrate that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process in order to prevail on a due process cause of action). Plaintiff alleges his due process rights were violated because he was denied impartial disciplinary hearings giving rise to his keeplock confinement. *See generally* Dkt. No. 37. Specifically, with respect to the disciplinary hearing held on April 17, 2008, he contends that defendant Bezio should have recused himself as the hearing officer because he participated in the underlying investigation giving rise to the issuance of the misbehavior report. Dkt. No. 37 at 2-5; *see also* Dkt. No. 57-9 at 51 (clarifying allegations in complaint). Plaintiff also maintains that defendant Rice is implicated in the due process violation because he (1) instructed plaintiff to cut his hair and (2) allegedly followed the orders of defendant Bezio to issue plaintiff a misbehavior report. Dkt. No. 37 at 2-4; *see also* Dkt. No. 57-9 at 66 (clarifying allegations in complaint). The basis for

plaintiff's claim that he was denied an impartial disciplinary hearing on May 2, 2008, is that defendant Chase postponed the hearing for more than an hour while he located defendant Bezio for his testimony. Dkt. No. 37 at 5-6; *see also* Dkt. No. 57-9 at 57 (clarifying allegations in complaint). During the adjournment, defendants Bezio and Chase allegedly rehearsed defendant Bezio's testimony. Dkt. No. 37 at 5-6; *see also* Dkt. No. 57-9 at 58 (clarifying allegations in complaint).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell*, 418 U.S. 539, 564-69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the

support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to. . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

In this case, plaintiff's allegation that he was denied due process at the hearing on April 17, 2008 because defendant Bezio both participated in an investigation on April 2, 2008 regarding plaintiff's dreadlocks, and conducted the disciplinary hearing is not, on its own, sufficient to give rise to a cognizable due process violation. *See Allred*, 2010 WL 3911414, at *5 (finding no due process violation where the plaintiff alleged that the hearing officer presiding over the disciplinary hearing also participated in the underlying investigation). Moreover, there is no evidence in the record to support plaintiff's suggestion that defendant Bezio prejudged the facts prior to hearing the evidence adduced at the disciplinary hearing.

Plaintiff's reliance on the DOCCS regulation that precludes "person[s] who ha[ve] participated in any investigation of the [underlying] acts" from presiding over the hearing as a hearing officer is misplaced. Dkt. No. 37 at 3-4; Dkt. No. 57-9 at 53-55. It is well settled that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred*, 2010 WL 3911414, at *5 (quoting *Baker v. McCollan*, 443 U.S. 137, 139-40 (1979)). Accordingly, to the extent that plaintiff in this case was afforded the protections required by the Constitution, defendant

Bezio's apparent violation of state law does not also constitute a due process violation.

Significantly, plaintiff does not allege, and there is no record evidence from which a reasonable factfinder could conclude, that he was denied (1) written notice of the charges giving rise to the hearing on April 17, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant Bezio, or (5) the right to assistance in preparing a defense. *See generally* Dkt. No. 37; Dkt. No. 57-3 at 11-17, 21-22; *Wolff*, 418 U.S. at 564-70. Moreover, even viewing the facts in the light most favorable to plaintiff, there was certainly reliable evidence of plaintiff's guilt with respect to the allegation that he failed to follow a direct order – the charge for which plaintiff was ultimately found guilty at the hearing on April 17, 2008. The court need not go any further than plaintiff's own admission at the disciplinary hearing that he "refused Sergeant Rice's order" to cut his hair to conclude that reliable evidence existed upon which defendant Bezio could support his guilty finding. Dkt. No. 57-3 at 15. In addition, to the extent plaintiff asserts a due process claim against defendant Rice based on allegations that Rice (1) ordered plaintiff to cut his hair and (2) followed defendant Bezio's order to issue him a

misbehavior report, it is not cognizable in light of the protections afforded plaintiff during the hearing. For all of these reasons, and based on the record evidence, I find that no reasonable factfinder could conclude that plaintiff was afforded inadequate due process during the disciplinary hearing on April 17, 2008. Accordingly, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

### b.   Disciplinary Hearing on May 2, 2008

Plaintiff's due process claim in connection with the hearing on May 2, 2008, stems from defendant Chase's alleged impartiality as the hearing officer. Dkt. No. 37 at 5-6; Dkt. No. 57-9 at 57. Specifically, plaintiff objects to the decision by defendant Chase to adjourn the proceeding so that he could locate and secure the testimony of defendant Bezio, the author of the misbehavior report at issue in the hearing. Dkt. No. 37 at 5-6; Dkt. No. 57-9 at 58. Plaintiff contends that during the adjournment, defendants Chase and Bezio rehearsed defendant Bezio's testimony. *Id.*

Initially, I find nothing in the record revealing a dispute of material fact with respect to whether plaintiff was denied (1) written notice of the charges giving rise to the hearing on May 2, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant

Chase, or (5) the right to assistance in preparing a defense. Dkt. No. 57-5 at 7-27. Moreover, a review of the hearing transcript and defendant Chase's written disposition reveals that there was reliable evidence on which he based his decision, including (1) plaintiff's own testimony that he was wearing the Tsalot-Kob and did not have his hair tied back on the day defendant Bezio issued the misbehavior report; and (2) the testimony of defendant Bezio that, on April 2, 2008, he had ordered plaintiff to cut his hair and not wear the Tsalot-Kob because plaintiff was not Rastafarian. *See id.* at 10 (plaintiff's testimony), 13-14 (defendant Bezio's testimony). Plaintiff's allegation that defendant Chase failed to conduct an impartial hearing – because he allegedly rehearsed the testimony of defendant Bezio off-the-record – is unsupported by any record evidence aside from plaintiff's claim that the two conversed before Bezio testified. *See* Dkt. No. 57-9 at 68-69 (plaintiff testifying at his deposition that "Lieutenant Chase admitted and Lieutenant Bezio admitted themselves (sic) that they had off the record conversations"). Both defendants Chase and Bezio flatly deny having rehearsed defendant Bezio's testimony off the record at the disciplinary hearing on May 2, 2008. Dkt. No. 57-3 at 5; Dkt. No. 57-5 at 3.

Assuming, however, that defendants Chase and Bezio did discuss defendant Bezio's testimony in advance, that fact alone does not render

defendant Chase partial as a hearing officer, or otherwise constitute a violation of plaintiff's due process rights. As an initial matter, plaintiff has failed to provide any legal support for his contention that, within the contours of due process, a right exists prohibiting witnesses participating in a prison disciplinary hearing from speaking with the hearing officer prior to testifying. Notably, despite its efforts, the court has similarly found no legal support for this proposition.[15] In any event, whatever due process violation may have occurred (and the court does not concede that a violation did occur) was cured by plaintiff's ample opportunity to question defendant Bezio at the hearing. Defendant Chase permitted plaintiff to ask defendant Bezio nearly all of his proposed questions, with the limited

---

[15]     Relatedly, the court is reminded that, with respect to the law governing the right of inmates to call their own witnesses at a prison disciplinary hearing, hearing officers are afforded significant discretion to permit or deny the testimony of a witness on multiple grounds, including institutional safety, relevance, or futility. *See, e.g., Wolff*, 418 U.S. at 566 ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses . . . whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases."); *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) ("We hold that if a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). By implication, the existence of this discretion suggests that hearing officers are permitted to contact witnesses in advance of a hearing to evaluate, for example, the relevance or necessity of their proposed testimony. *Cf. Shell v. Brzezniak*, 365 F. Supp. 2d 362, 377 (W.D.N.Y. 2005) (rejecting an inmate-plaintiff's claim that his due process rights were violated when a hearing officer failed to speak with two inmate witnesses personally to inquire into their reasons for refusing to testify at the plaintiff's hearing).

exception of those that were duplicative of earlier questions or those that were deemed irrelevant.[16] Dkt. No. 57-5 at 14-20.

Accordingly, in light of the undisputed record evidence that plaintiff was afforded the process demanded by the Constitution, as identified by the Supreme Court, with respect to the May 2, 2008 disciplinary hearing, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

### D.    Plaintiff's Harassment Claims

Liberally construed, plaintiff's amended complaint also asserts a claim against defendant Bezio stemming from an allegation that he verbally harassed plaintiff during the disciplinary hearing on May 2, 2008. Dkt. No. 37 at 5; *see also* Dkt. No. 57-9 at 60 (clarifying allegations in complaint). Verbal harassment, however, without more, is not cognizable under section 1983. *See, e.g., Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) (McAvoy, J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under [section] 1983." (citing cases)). Accordingly, I recommend that plaintiff's harassment claim be dismissed.

---

[16]     For example, on the basis of relevance, defendant Chase did not permit plaintiff to ask defendant Bezio "[w]hy [defendant Bezio] is racist." Dkt. No. 57-5 at 16.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

After a careful review of the record in this case, I find that, although a dispute of material fact exists regarding whether plaintiff was deprived of a liberty interest, no reasonable factfinder could conclude, based on the record evidence, that plaintiff was denied adequate due process before being sentenced to keeplock confinement.[17]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 57) be GRANTED, and that the plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

---

[17]   In light of these findings, I have not addressed defendants' argument regarding the applicability of qualified immunity.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 30, 2014
              Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge


Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

*1 On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.[FN1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

FN1. The claims brought by the plaintiff that
survived summary judgment were tried before a
jury on October 4, 1998. On October 6, 1998,
the jury returned a verdict for LaBounty on his
claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. LaBounty v. Kinkhabwala, No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. LaBounty v.
Coombe, et al., No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.[FN2]

FN2. To the extent that the plaintiff reiterates in
his opposition claims that have been previously
dismissed or makes new claims unrelated to the
issues which have been remanded, those claims
are not properly before this Court and the Court
does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

*3 While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

*4 A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." _Tellier v. Fields_,-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in _Sandin v. Connor,_ 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. _Tellier,_-F.3d-, 2001 WL 457767, at *7. " 'As a result of _Sandin,_ a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' _Id._ (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. _Id._ "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " _Sims v. Artuz,_ 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." _Id._ " 'The content of the _Sandin_ standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' _Colon v. Howard,_ 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. _See_ N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 _et seq.; Colon,_ 215 F.3d at 230 (stating that "normal conditions of SHU

confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

*5 The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of _Sandin, Sims,_ 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. _See also Colon,_ 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. _Taylor v. Rodriguez,_ 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. _See Welch v. Bartlett,_ 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. _Kalwasinski v. Morse,_ 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

> Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:
>
> (a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.
>
> (b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.
>
> (c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> FN7. The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> FN8. The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> FN9. The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

### CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions
for relief from judgment and for recusal of the
undersigned. For the reasons set forth below, Plaintiff's
motions are denied.

### I. BACKGROUND

Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
commenced the present 42 U.S.C. § 1983 action alleging
violations of his Constitutional Rights on August 5, 1994.
On July 18, 1993, while Plaintiff was incarcerated at
Riverview Correctional Facility, defendant Baker alleges
that she witnessed Plaintiff exposing himself to her in the
recreation yard. Plaintiff was then taken from the yard
to the infirmary by defendants Baker, Smith, and Hamilton.
In his Amended Complaint, Defendant alleges, in relevant
part, that he was repeatedly assaulted by defendants
Davis, Smith, Mushen, and Hamilton while defendants
Liscum, Baker, and Emery stood by and watched in
violation of his Eighth Amendment rights. Plaintiff then
alleges that he was escorted to the prison's special housing
unit ("S.H.U.") and received further physical mistreatment
from defendants Emery, Mushen, Hamilton, Smith, Farns,
and Lincoln.

Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the
disciplinary proceeding resulting from the incident, which
was conducted by defendant Brunet. Finally, Plaintiff
alleges that defendant Barkley participated in the violation
of these rights by failing to address Plaintiff's grievances
and by designating a biased hearing officer, defendant
Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and
Barkley ("Defendants") filed a motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an
affirmation in opposition to Defendants' motion on June
23, 1999 and a letter response on July 6, 1999. By an
Order dated October 25, 1999, this Court granted
Defendants' motion for summary judgment and dismissed
Plaintiff's case against them in its entirety.[FN1] Plaintiff's
current motions for relief from judgment and recusal were
filed on November 12, 1999 and March 23, 1999,
respectively.

> FN1. Also still pending before the Court is a
> motion for summary judgment filed by Plaintiff
> September 1, 1998. The motion was originally
> dismissed by the Court's Order adopting the
> Report–Recommendation of United States
> Magistrate Judge David R. Homer, which held
> that the motion was untimely and, in the
> alternative, that it failed on the merits. Then, by
> an Order dated June 1, 1999, the Court vacated
> its previous order and held that Plaintiff's motion
> would be addressed on the merits, along with
> Defendants' motion for summary judgment.
> However, Judge Homer's
> Report–Recommendation did address the merits
> of Plaintiff's motion. The Court has undertaken a
> de novo review of the record and has determined
> that Plaintiff's motion should be dismissed for the
> reasons discussed in the
> Report–Recommendation.

### II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).
Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at \*5– \*6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at \*3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at \*\*1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U .S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at \*2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at [*]6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at [**]2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at [**]2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible.' " *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

*9 ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**

C

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing Officer Sgt. Noto,
Defendants.

No. 06–CV–0456Sr.
Oct. 5, 2010.

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Gowanda Correctional Facility ("Gowanda") his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 18. For the following reasons, defendants' motion for summary judgment is granted and the plaintiff's complaint is dismissed in all respects.

### BACKGROUND

Plaintiff filed this action on July 11, 2006, against defendants, Michael Knowles and Louis

Noto, pursuant to 42 U.S.C § 1983, seeking monetary damages. *Id.* The action arises from a misbehavior report issued on or about July 27, 2003 by defendant Noto against plaintiff and the resulting Tier III disciplinary hearing conducted by defendant Knowles. *Id.* Specifically, the complaint alleges the issuance of a false misbehavior report, retaliation and violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS") housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1. Defendant Knowles was a Captain at Gowanda and his duties included, from time to time, conducting inmate disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp. 1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp. 1–2.

On July 22, 2003, at approximately 8:30 p.m., Correctional Officer Millich discovered several marijuana cigarettes during a search of inmate Meja's cell. Dkt. # 22, p. 3. Consequently, defendant Noto initiated an investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22, p. 3. Defendant Noto maintained that Meja told him that he had purchased the marijuana cigarettes from plaintiff. Dkt. # 22, p. 3. Based on Meja's identification of plaintiff and information allegedly received from confidential informant(s)—who identified plaintiff as a drug dealer and indicated that the sale in question occurred between 7:00 and 8:00 p.m. on July 22, 2003 in the prison yard—defendant Noto issued a misbehavior report charging plaintiff with violating Inmate Rule 113.25. Dkt. # 1, pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25 provides that "an inmate shall not make, possess, sell or exchange any narcotic, narcotic paraphernalia, controlled substance or marijuana. An inmate shall not conspire with any person to introduce such items into the facility." Dkt. # 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

On July 28, 2003, a Tier III disciplinary hearing was conducted before defendant Knowles. Dkt. # 1, p. 23; Dkt. # 21, p. 2. At the hearing, plaintiff testified in his own defense that he was at a Nation of Islam ("NOI")/Black studies program during the period of the alleged drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. # 21, p .6. Plaintiff called two other inmates, Ford and Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. *Id.* Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

## DISCUSSION AND ANALYSIS
### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

propriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell*[FN1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

FN1. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that plaintiff was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id* . Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him.[FN2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. #

21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

> FN2. Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession **and** sale of a narcotic. Dkt. # 21, pp. 5 and 19.

**Impartial Hearing Officer**

Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s), which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 FN3) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

> FN3. 7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to pro-

tection under the federal constitution do not themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,*

239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation

with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8 SO ORDERED.**

W.D.N.Y.,2010.
Allred v. Knowles
Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5463720 (N.D.N.Y.)
**(Cite as: 2013 WL 5463720 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Leroy DORSEY, Plaintiff,
v.
Dale ARTUS et al., Defendants.

No. 9:09–cv–1011 (GLS/DEP).
Sept. 30, 2013.

Leroy Dorsey, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Adele M. Taylor–Scott
, Assistant Attorney General, of Counsel, Albany,
NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*
GARY L. SHARPE, Chief Judge.
### I. *Introduction*
**\*1** Plaintiff *pro se* Leroy Dorsey commenced
this action against a host of defendants-all of whom
have since been dismissed with the exception of
Dale Artus, Superintendent of Clinton Correctional
Facility and various John and Jane Does-pursuant
to 42 U.S.C. § 1983, alleging the deprivation of his
civil rights. (Am.Compl., Dkt. No. 17.) Dorsey's
only remaining causes of action involve his claim
that the Doe defendants, in two separate incidents,
were deliberately indifferent to serious medical
needs in violation of the Eighth Amendment. (Dkt.
No. 31.) Pending before the court are cross motions
for summary judgment, and two motions for pre-
liminary injunctive relief sought by Dorsey.
(Dkt.Nos.78, 84, 86, 93.) In a Re-
port–Recommendation and Order (R & R) dated
September 3, 2013, Magistrate Judge David E.
Peebles recommended that defendants' motion for
summary judgment be granted, and Dorsey's sum-
mary judgment motion be denied, along with his
motions seeking preliminary injunctions. (R & R,
Dkt. No. 97.) For the reasons that follow, the R & R
is adopted in its entirety.

### II. *Background*
Dorsey, an inmate in the custody of the New
York State Department of Corrections and Com-
munity Supervision, was housed in Clinton Correc-
tional Facility at the time relevant to this action. (
*See generally* Dkt. No. 17.) Dorsey contends that
four Doe defendants denied him access to certain
medical equipment and his daily medication, and
that two other Doe defendants refused him medical
attention when, after eating breakfast one morning,
his face and mouth swelled. (*Id.* at 8, 10.)

### III. *Standard of Review*
Before entering final judgment, this court
routinely reviews all report and recommendation
orders in cases it has referred to a magistrate judge.
If a party has objected to specific elements of the
magistrate judge's findings and recommendations,
this court reviews those findings and recommenda-
tions *de novo. See Almonte v. N.Y. State Div. of Pa-
role,* No. 04–cv–484, 2006 WL 149049, at *6–7
(N.D.N.Y. Jan. 18, 2006). In those cases where no
party has filed an objection, or only a vague or gen-
eral objection has been filed, this court reviews the
findings and recommendations of the magistrate
judge for clear error.[FN1] *See id.*

> FN1. "[A] report is clearly erroneous if the
> court determines that there is a mistake of
> fact or law which is obvious and affects
> substantial rights." *Almonte,* 2006 W L
> 149049, at *6.

### IV. *Discussion*
Dorsey only generically objects to the R & R,
claiming that he is an "indigent plaintiff whose
rights [were] violated, and the defendants get to
hide behind lawyers, plus get away with violating
the [Eighth A]mendment." (Dkt. No. 98 at 1.) This
"objection" is general and triggers review for clear
error. *See Almonte,* 2006 WL 149049, at *6. Having
thoroughly reviewed the R & R, the court finds no
clear error in Judge Peebles' recommendations on
the pending motions, and adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' ReportRecommendation and Order (Dkt. No. 97) is **ADOPTED** in its entirety; and it is further

**\*2 ORDERED** that Dorsey's motions for a preliminary injunction (Dkt. Nos.78, 84) are **DENIED;** and it is further

**ORDERED** that Dorsey's motion for summary judgment (Dkt. No. 93) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 86) is **GRANTED;** and it is further

**ORDERED** that Dorsey's amended complaint (Dkt. No. 17) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

*REPORT, RECOMMENDATION, AND ORDER*
DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Leroy Dorsey, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. Following an extensive procedural history, including dismissal of the action and a subsequent reversal by the United States Court of Appeals for the Second Circuit, the causes of action now before the court arise from two instances of alleged deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment, asserted against six defendants who have yet to be identified and joined in the action.

Currently pending before the court in connection with the action are several motions. Plaintiff has moved for preliminary injunctive relief and the entry of summary judgment. Defendant Dale Artus, the Superintendent at Clinton Correctional Facility—who has been substituted in this action solely for the purpose of aiding plaintiff in identifying the Doe defendants—has cross-moved for summary judgment dismissing plaintiff's complaint based upon his failure to exhaust available administrative remedies before commencing suit. For the reasons set forth below, I recommend that (1) plaintiff's two pending requests for a preliminary injunction be rejected, one as moot and the other as seeking relief already denied by the court; (2) plaintiff's summary judgment motion be denied as premature in light of the fact that the unidentified defendants implicated in the remaining causes of action have not yet been identified and served, nor had an opportunity to respond to plaintiff's motion; (3) defendant's motion for summary judgment be granted based upon plaintiff's failure to exhaust administrative remedies before commencing suit; and (4) plaintiff's complaint be dismissed in its entirety.

I. *BACKGROUND*

Plaintiff is a prison inmate currently held in custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the Elmira Correctional Facility ("Elmira"), located in Elmira, New York. Docket Entry Dated January 20, 2011. At the time of the relevant events, plaintiff was confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *See generally* First Amended Complaint (Dkt. No. 17). FN1

> FN1. As will be explained more fully below in part II of this report, the complaint dismissed by this court but partially restored by virtue of the Second Circuit's decision was an amended complaint filed by the plaintiff on January 22, 2010 ("first amended complaint"). Dkt. No. 17. That complaint remains the operative pleading

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the case despite plaintiff's two sub-sequent attempts to file further amended complaints.

**\*3** Liberally construed, plaintiff's first amended complaint alleges that unidentified defendants "4 Young Officers" denied plaintiff access to breathing machine filters and accessories and interfered with his access to daily medications. First Amended Complaint (Dkt. No. 17) at 8. It is also alleged that, on July 13, 2009, after eating breakfast, his face and mouth swelled. *Id.* at 10. Plaintiff maintains that unidentified defendants "Medication Nurse" and "Escort [Corrections Officer]" refused him immediate medical attention for that condition. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 8, 2009. Dkt. No. 1. Since its inception, the case has had a lengthy procedural history. Plaintiff has filed several motions seeking preliminary injunctive relief, all of which were denied principally upon the ground that they raise matters and seek relief unrelated to the causes of action asserted in his first amended complaint. *See, e.g.,* Dkt Nos. 5, 10, 15, 42, 43, 53, 57, 60, 61, 63, 78, 84. In addition, plaintiff has filed three separate amended complaints in the case, only one of which has been accepted for filing to date. Dkt. Nos. 17, 70, 81. More specifically, on August 1, 2012, without leave of court or defendants' written consent, plaintiff filed a second amended complaint in the action. Dkt. No. 70. Plaintiff then filed a third amended complaint on September 26, 2012, also without the consent of the defendants or leave of the court. Dkt. No. 91. Those pleadings were filed in violation of Rule 15 of the Federal Rules of Civil Procedure, which requires that a party seeking to file an amended pleading either obtain consent from the opposing party or leave from the court prior to filing. Fed.R.Civ.P. 15(a)(2). Moreover, plaintiff's submissions violated Rule 7.1 of the local rules of practice for this court, which requires that a motion for leave to file an amended pleading "must set forth specifically the proposed amendments and identify

the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means." N.D.N.Y. L.R. 7.1(a)(4). For these reasons, plaintiff's second and third amended complaints are not accepted for filing, and are stricken from the record.FN2 Accordingly, the operative pleading at this juncture of the proceedings is plaintiff's first amended complaint, Dkt. No. 17.

> FN2. Although plaintiff was granted leave to file a second amended complaint by Chief District Judge Gary L. Sharpe's decision order dated September 12, 2011, Dkt. No. 43 at 3–4, plaintiff failed to timely file his second amended complaint. Specifically, Judge Sharpe ordered that any second amended complaint must be filed within thirty days of the date of that order. Because plaintiff did not file that pleading until nearly a year later, it is untimely and will not be considered by the court.

On May 19, 2010, Judge Sharpe issued a decision and order dismissing the action; judgment was entered on that same day. Dkt. Nos. 25, 26. The Second Circuit Court of Appeals vacated that judgment on November 12, 2010, and the matter was remanded solely with respect to plaintiff's claims that

(1) 'Medication Nurse' and 'Escort C.O.' were deliberately indifferent to [plaintiff's] serious medical needs, in violation of the Eighth Amendment; and (2) "4 Young Officers' were deliberately indifferent to [plaintiff's] serious medical needs and/or deliberately interfered with his medically prescribed treatment solely for the purpose of causing him unnecessary pain in violation of the Eighth Amendment[.]

**\*4** Mandate (Dkt. No. 31) at 1–2.

Following the Second Circuit's Mandate, Judge Sharpe issued a decision and order, dated September 12, 2011, reiterating that the claims in the ac-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion are now limited to the deliberate medical indifference claims identified in the Second Circuit's decision, and emphasizing to plaintiff that he must identify the "Doe" defendants referenced in his complaint. Dkt. No. 43 at 3–4. A subsequent decision and order, dated January 23, 2012, directed that Clinton Superintendent Dale Artus be added as a defendant, not because any of plaintiff's claims were properly asserted against him, but instead solely to facilitate service and discovery in order to aid plaintiff in identifying the Doe defendants. Dkt. No. 49.

Currently pending before the court are four motions. On September 20, 2012, the plaintiff submitted a document entitled "Affirmation of Services." Dkt. No. 78. That letter addresses both plaintiff's continuing efforts to ascertain the identities of the Doe defendants against whom his claims are asserted, and raises incidents alleged to have occurred at Clinton, including food poisoning, denial of treatment and medications, and a search of his cell, that are all unrelated to his surviving causes of action. *Id* . In that letter, plaintiff requested that he be returned to Elmira. *Id.* Because of its nature and the relief requested, that letter has been construed by the court as a request for a preliminary injunction.

Plaintiff subsequently filed a preliminary injunction motion on October 4, 2012, requesting that the court direct officials at Elmira, where he is now confined, to afford him access to law books and legal materials. Dkt. No. 84. On October 11, 2012, defendant Artus responded to plaintiff's motions for preliminary injunction and cross-moved for summary judgment dismissing plaintiff's first amended complaint. Dkt. Nos. 86, 87. In his motion, defendant argues that plaintiff is not entitled to a preliminary injunction, and that this action is subject to dismissal based upon his failure to exhaust the available administrative remedies before commencing suit. *See generally* Def.'s Memo. of Law (Dkt. No. 86–3).

On October 25, 2012, plaintiff filed a document entitled "plaintiff's request for summary judgment."

Dkt. No. 93. In that document, plaintiff asserts that defendants have "wasted this court[']s time" for three years and he is therefore entitled to the entry of summary judgment. *Id.* at 3.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Plaintiff's Preliminary Injunction Motions*

Plaintiff's two pending motions for a preliminary injunction are the latest in a series of such motions brought by the plaintiff in this action. *See, e.g.,* Dkt. Nos. 5, 10, 42, 53, 60, and 61. All of those motions have been denied. Dkt. Nos. 15, 43, 57, and 63. In the court's orders denying those earlier requests for injunctive relief, plaintiff was advised that such requests concerning matters unrelated to the allegations contained in his complaint cannot be granted in this action. *See, e.g.,* Decision and Order (Dkt. No. 43) at 7; Decision and Order (Dkt. No. 57) at 5.

**\*5** In the first of the two motions for preliminary injunction now pending before the court, plaintiff requests a transfer from Clinton to Elmira. Dkt. No. 78. Because the court's records reveal that the plaintiff is currently confined in Elmira, I recommend that this motion be denied as moot. *See Steffel v. Thompson,* 415 U.S. 452, 459 n. 10 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."); *Mason v. Coughlin,* No. 84–CV–7861, 1985 WL 298, at \*1 (S.D.N.Y. Feb. 20, 1985) ("[T]he defendants assert that they have acceded to the plaintiff's reqeuest [sic], and have transferred him to another facility. In view of this it appears to the Court that plaintiff's motion for a preliminary injunction is now moot."). FN3

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

Plaintiff's second preliminary injunction application relates to access to the courts. Dkt. No. 84. That request for injunctive relief, like several others previously filed, concerns matters unrelated to the medical indifference claims that remain in dispute in this action. Accordingly, I recommend that plaintiff's second request for preliminary injunction also be denied.[FN4] *See McAllister v. Goord,* No. 06–CV–0442, 2009 WL 5216953, at *2 (N.D.N.Y. Dec. 30, 2009) (McAvoy, J.) ("In other words, the relief that a plaintiff seeks by way of injunction must relate to the allegations contained in the underlying complaint." (emphasis omitted) (citing *Allen v. Brown,* No. 96–CV–1599, 1998 WL 214418, at *2 (N.D.N.Y. Apr. 28, 1998) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.))).

FN4. Plaintiff also raised the issue of denial of access to the courts by letter dated February 23, 2011. Dkt. No. 33. Because that claim is unrelated to the claims asserted in this action, the court advised plaintiff to pursue his court-access concerns initially through the grievance process at Elmira, and if necessary, through a separate legal action. Text Order Dated Feb. 24, 2011. Similarly, plaintiff complained of the conditions of confinement at Elmira in a letter dated June 14, 2011, Dkt. No. 40, and the court struck that letter because the matters raised were unrelated to the claims asserted in this action, Text Order Dated June 15, 2011.

B. *Legal Standard Governing Motions for Summary Judgment*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*6** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); see also *Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Plaintiff's Motion for Summary Judgment*

Plaintiff's summary judgment motion does not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

address the merits of his claims, but instead hinges upon the perceived failure of the Doe defendants to come forward and identify themselves to him through the course of pretrial discovery. Dkt. No. 93 at 2–3. The court has previously advised plaintiff that an alleged failure to provide discovery does not form a basis for the entry of summary judgment. Text Minute Entry Dated Aug. 1, 2012. In any event, the court has, on several prior occasions, addressed plaintiff's claims regarding discovery, and finds no basis to conclude that defendants have not fully complied with all court-issued discovery orders.

I note, moreover, that plaintiff's summary judgment motion is procedurally and legally deficient, as well as premature. On August 20, 2012, Dorsey submitted a motion for summary judgment. Dkt. No. 72. The court denied the motion without prejudice to plaintiff's right to renewal upon a proper showing, and in full compliance with the requirements of Rule 7.1 of the local rules of practice for this court, which governs such motions. Text Order Dated Aug. 31, 2012. More specifically, Rule 7.1(a) requires that motions for summary judgment include a(1) memorandum of law, (2) at least one supporting affidavit, (3) proof of service, and (4) a statement of undisputed material facts. N.D.N.Y. L.R. 7.1(a)(1)-(3). Because plaintiff's most recent attempt to move for summary judgment once again fails to comply with those requirements, his motion is subject to denial on this procedural basis.

The motion is also legally deficient, in that it fails to satisfy plaintiff's obligation to demonstrate the lack of any genuine dispute of material fact surrounding his claims. *See Sec. Ins. Co. of Hartford, 391 F.3d at 83* ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment."). Additionally, plaintiff's motion is premature because the only defendant who has been named and appeared in the action is the superintendent at Clinton, and the court has made it clear to plaintiff that there is no evidence of defendant Artus' involvement, and

therefore he bears no responsibility for the acts alleged in plaintiff's first amended complaint. Decision and Order (Dkt. No. 49) at 6. Instead, he was named as a defendant only as a matter of convenience to permit Dorsey to engage in discovery to assist him in ascertaining the identity of the six defendants intended to be named. *Id.* Because those defendants have not been identified, substituted as parties, and given the opportunity to respond to plaintiff's first amended complaint and summary judgment motion, plaintiff's motion is premature.

**\*7** For all of the foregoing reasons, I recommend that plaintiff's motion for summary judgment be denied.

D. *Defendant's Motion for Summary Judgment*

In his motion, defendant contends that the action must be dismissed based upon plaintiff's failure to satisfy his obligation to exhaust the available administrative remedies before commencing suit. Def.'s Memo. of Law (Dkt. No. 86–3) at 3–5.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

.

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216 (2007).

In accordance with the PLRA, the DOCCS has made a grievance procedure, called the Inmate Grievance Program ("IGP"), available to inmates. It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C .R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

***8** A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal.[FN5] *Id.* at § 701.5(c)(i), (ii).

> **FN5.** Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to is-

sue a decision. *Id.* at § 701.5(c) (i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C .R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In support of his motion, defendant Artus has submitted evidence suggesting that plaintiff did not file a grievance concerning the two incidents remaining at issue in this case. Certified records submitted by Deborah L. Jarvis, the DOCCS Inmate Records Coordinator, reflect that, although plaintiff has filed many grievances while incarcerated, including nine in 2009, none relate to the incidents at issue in this case. *See* Taylor–Scott Decl. Exh. A (Dkt. No. 86–1). Also submitted in support of the motion is a declaration from Jeffrey Hale, Assistant Director of the IGP, listing 148 grievances that have been appealed by plaintiff to the CORC while in custody of the DOCCS. Hale Decl. Exh. A (Dkt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 86–2) at 4–8. According to Hale, there is no record of plaintiff appealing to the CORC a grievance regarding a lack of adequate medical care at Clinton in 2009. Hale Decl. (Dkt. No. 86–2) at ¶¶ 2–4.

Countering this evidence are plaintiff's statements that he filed grievances at Clinton regarding the incidents alleging deliberate medical indifference by the Doe defendants, and that he pursued those grievances to completion through the CORC. Plf.'s Resp. 7.1(a) (3) Statement (Dkt. No. 92) at ¶¶ 11, 12. Plaintiff offers no explanation, however, for why, if he did file grievances and appeal their denials to the CORC, prison officials have no record of those grievances despite many others filed by him and pursued to completion, nor does he provide copies of those grievances or specify the grievance numbers assigned to them. *Id.* Moreover, plaintiff's contentions regarding exhaustion are made in his response to defendant's rule 7.1(a)(3) statement, but he fails to support them with accurate record citations. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial shall set forth a specific citation to the record where the factual issue arises."). Although plaintiff cites to the certified copies of grievances by Jarvis, and Hale's declaration (both of which were submitted by defendant in support of his motion), a careful review of that evidence reveals that he, in fact, did not appeal his grievances related to this action to the CORC. Based on the lack of any evidentiary support in the record to show that plaintiff filed grievances addressing the allegations regarding the defendant Doe's conduct regarding medical treatment, I conclude that plaintiff failed to rebut defendant's contention that he failed to exhaust available administrative remedies, which is supported by evidence in the record. Although the court is mindful that, on a motion for summary judgment, it is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff, *Terry,* 336 F.3d at 137, it is also true that conclusory, self-serving affidavits that are unsupported by any factual detail are insufficient to give rise to a dispute of material fact. *See Zappia Middle East Const. Co. Ltd. v. Emirate of Abu* Dhabi, 215 F.3d 247, 253 (2d Cir.2000) ("The conclusory allegations in Mr. Zappia's affidavit are not sufficient to create a material issue of fact."); *Belcher v. Serriano,* No. 95–CV–1340, 1998 WL 173169, at *1 (N.D.N.Y. Apr. 9, 1998) (Pooler, J.) (holding that the plaintiff's complaint and an affidavit submitted in opposition to the defendants' motion for summary judgment were "[in]sufficient to overcome summary judgment," particularly where "his affidavit contains no factual support"); *see also Robert v. Dep't of Justice,* No. 05–CV–2543, 2005 WL 3371480, at *8 (E.D.N.Y. Dec. 12, 2005) (finding, on a motion for summary judgment, that the "[p]laintiff's conclusory statement" that he "timely appealed all three decisions ... fails to rebut [the d]efendants' competent evidence showing an absence of genuine issue of fact that [he] has not administratively exhausted the ... requests").

**\*9** Plaintiff's failure to exhaust, however, does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to

comply with the applicable administrative procedure requirements. *Id.*

In this instance, there is no record evidence to suggest that the IGP was not fully available to the plaintiff in this matter. Indeed, the certified copies of plaintiff's grievances and the records attached to Hale's declaration demonstrate that, during his custody by the DOCCS, the IGP was available to plaintiff, and he availed himself of the grievance process extensively. Taylor Scott Decl. Exh. A (Dkt. No. 86–1); Hale Decl. Exh. A (Dkt. No. 86–2). Turning to the second inquiry, there is no record evidence that suggests defendants forfeited the exhaustion defense, and plaintiff has not alleged as much. Finally, nothing in the record suggests that special circumstances exist that may justify plaintiff's failure to exhaust the available administrative remedies. Accordingly, because I find no reason to conclude that plaintiff should be excused from the exhaustion requirement, I recommend that his complaint be dismissed on this procedural ground.

IV. *SUMMARY AND RECOMMENDATION*

Pending before the court are several motions filed by both parties. Plaintiff's applications for injunctive relief are subject to denial, one on the basis that it is now moot, and the second because, like several of his prior requests, it addresses matters unrelated to the claims asserted in his complaint in this action. Plaintiff's motion for summary judgment is similarly subject to denial both as premature, and as failing to comply with the court's local rules governing such motions. Turning to defendant's motion, I conclude that, based upon the record now before the court, no genuine dispute of material fact exists as to whether plaintiff failed to comply with his obligation to exhaust available administrative remedies before commencing this action, and that his complaint is therefore subject to dismissal on this procedural basis. Accordingly, it is hereby respectfully

**\*10** RECOMMENDED that plaintiff's motions for a preliminary injunction (Dkt. Nos.78, 84) be

DENIED; and its further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 93) be DENIED; and it is further

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 86) be GRANTED and plaintiff's complaint in this action be DISMISSED; and it is further

ORDERED that plaintiff's second and third amended complaints (Dkt .Nos.70, 81) be stricken from the record due to plaintiff's failure to comply with the applicable rules governing motions for leave to file amended complaints.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) , 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2013.
Dorsey v. Artus
Slip Copy, 2013 WL 5463720 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.